**LASER ALIGNMENT, INC., and Contractors Automated Devices, Inc., Plaintiffs-Appellants,**

v.

**WOODRUFF & SONS, INC., and Roy J. Woodruff, Defendants-Appellees.**

**Nos. 72–1254, 72–1255.**

United States Court of Appeals, Seventh Circuit.

Argued April 4, 1973.

Decided Jan. 22, 1974.

Donald· H. Zarley, Des Moines, Iowa, Lloyd A. Heneveld, Grand Rapids, Mich., for plaintiffs-appellants.

Eugene C. Knoblock, South Bend, Ind., for defendants-appellees.

Before CLARK,* Associate Justice, and FAIRCHILD and PELL, Circuit Judges.

PELL, Circuit Judge.

Plaintiffs Laser Alignment, Inc., (Alignment) and Contractors Automated Devices, Inc., (Contractors) brought this patent infringement action against Woodruff & Sons, Inc., (Woodruff) and Roy J. Woodruff, alleging infringement of Trice Patent No., 3,116,557, owned by Contractors and licensed exclusively to Alignment. The Trice patent, issued January 7, 1964, and entitled "Method and Means for Laying Sewer Pipe," involves, in the words of the patent, "a method and means for laying said pipeline on a selected grade line by resort to establishing a light beam line of reference." The complaint sought a permanent injunction, triple damages, and costs. In their answer and counterclaim, the defendants challenged both validity and infringement. They also asserted misuse of the patent as a defense.

After a full trial on the merits, the district court held: (1) the Trice patent is valid; (2) the defendants had not infringed the patent; and (3) the plaintiffs had not misused the patent. Plaintiffs appeal the finding of noninfringement. Defendants appeal the court's resolution of the other two issues.

I

Prior to the development of Trice's method for laying underground pipe, pipes usually had been laid by the batterboard or the offset batterboard methods. Both traditional methods required supporting rigid boards on support stakes at predetermined altitudes and strings tied between the stakes from which measurements were taken to align properly the sections of pipe. This procedure, despite being time-consuming and costly, was often inaccurate.

James Trice, a pipe-laying entrepreneur discomfited by the unsatisfactory prevailing methods, experimented with improvements. Eventually, he decided that the use of a collimated beam of light smaller than the inside diameter of

* Associate Justice Tom C. Clark, United States Supreme Court, Retired, is sitting by designation.

the pipe to be laid was a better method. He thereupon developed a projector to create the parallel light rays. The apparatus projected the collimated beam into a ring-shaped target housing on which there was a piece of frosted glass with cross hairs thereon. Using his light projector and target, he was able to lay and align sections of pipe.

On December 4, 1957, Trice filed a patent application. It contained claims devoted to an apparatus, to a method, and to a system. The application pended for more than six years, following which time the Patent Office granted Trice patent No. 3,116,557 on two method or process claims.[1] Significantly, no patent was granted on apparatus. Trice's method, in the words of the district court,

> "was characterized by a series of steps including projecting a collimated narrow beam of light in a trench along a desired course for the pipeline and then individually positioning or stacking the sections of the pipe, seriatim, end-to-end, one after another, with their axes along this beam, the light beam being projected through the pipes and the position of each pipe being observed by sighting with a target having a translucent screen re-

movably inserted in the end of each pipe section to extend across the pipe axis."

After receiving his patent, Trice set up a corporation, Contractors Automated Devices, Inc., which manufactured several systems called the "Beam-A-Ligner." Three contractors bought these systems and successfully practiced the method by the use of the equipment.

At about the same time that Trice was beginning to produce his "Beam-A-Ligner," a Michigan contractor, Roger Roodvoets, heard about a light beam, with a laser as its source, that Laser Lign, Inc., of Illinois was manufacturing for use in sewer construction. The laser —the device's name is an acronym for "L(ight) a(mplification by) s(timulated) e(mission of) r(adiation)"—had not yet been invented when Trice filed his patent application in 1957. The principal features of the laser, the district court found, are "its single-frequency characteristic, its energy density characteristic, and the inherent high degree of collimation or directionality of its beam without assistance of any kind of lens. All sources of light other than the laser and the sodium arc lamp at two frequencies tend to emit light in all directions and beams therefrom are collimated by

---

1. Claim 1 of the patent as issued provides: "1. A method of laying a plurality of pipe sections along a selected rectilinear axis to form a subterranean string of pipe sections extending from a source position comprising the steps of projecting a collimated narrow beam of light from said source position along the selected axis, placing a first pipe section at a position wherein said light beam passes therethrough with an end thereof incident to said light beam disposed closely adjacent said source position and coaxially aligned with said light beam, rigidly coupling a target housing member having a translucent target screen to the exit end of said first pipe section relative to said light beam at a position disposing the target screen across the axis of the pipe section, moving said target housing member transversely of said selected axis and thereby moving said exit end of said pipe section while observing said target screen to locate the light beam intercept with said target screen at a position aligned with the axis of said pipe section whereby said exit end of said first pipe section is coaxially aligned with said selected axis, fixing said first pipe section in its aligned position, and serially laying other pipe sections in coaxial alignment with said selected axis by transferring said target housing member to one end of each successive pipe section corresponding to said exit end, coupling the other end of such successive pipe sections to the exit end of the preceding section, and coaxially aligning the exit ends of such other pipe sections with said selected axis by moving said target housing member in the manner recited for aligning said first pipe section."

Claim 2 basically reiterates Claim 1 but adds the additional information that the collimated narrow beam of light is projected "from a projector at said source position along the selected axis" and also provides for "coaxially aligning said incident end of said first pipe section with the light beam by observing the disposition thereof relative to said projector."

eliminating the element of divergence." The laser became available to the public only in 1963 and was not widely known until the mid 1960's.

Trice in his experimentation prior to the invention of the laser had achieved the nondiffusing effect apparently inherent in the laser beam by placing a lens the exact focal length away from a light source, thereby creating parallel light rays. The patent he was granted, however, was for a method and not for apparatus, and the claims of the patent here involved refer to a collimated narrow beam of light rather than to particular apparatus projecting that light.

Roodvoets's firm experimented for over a year with the Laser Lign equipment but was unable to make the apparatus perform satisfactorily. While negotiating with a Michigan company to build a complete laser with housing and grade equipment, Roodvoets learned of the Trice patent and Trice's "Beam-A-Ligner" apparatus. Roodvoets purchased one of these systems and successfully laid 200 feet of pipe with it. He decided, however, that the newly discovered laser source should be substituted for the white light source of the "Beam-A-Ligner." Alignment, the firm that Roodvoets had formed, entered into an agreement with Trice, improved the equipment, adapting it to a laser light source, and later offered it commercially. Alignment followed a policy of selling its apparatus only in conjunction with the grant of a sublicense to practice the patented Trice method. However, contractors who wished to purchase equipment from other companies could obtain licenses on the same terms as Alignment's customers did.

In November 1963, an Arkansas concern, Blount and George, was founded to further Blount's idea, apparently conceived without knowledge of Trice's earlier work, of laying pipe with a light beam instead of by the traditional, cumbersome batterboard method. In early 1964, after having tested other light sources, Blount and George began to experiment with lasers and built an apparatus called the "Automated Grade Light" (AGL). Several contractors used this equipment in mid 1964. Subsequently, on September 10, 1964, Blount and George filed a patent application asserting ten claims. The Patent Office in January 1966 rejected seven of the claims, one (claim no. 10) because it was deemed unpatentable over the Trice method.[2] Blount and George amended its application, and, on October 18, 1966, the Patent Office granted patent 3,279,070 on seven claims. These claims, however, pertain only to specific apparatus.

Defendant Woodruff corporation read a December 1964 newspaper article about Blount and George's AGL system and, as a consequence, purchased some of the equipment. Woodruff eventually became a distributor of Blount and George's apparatus.

On or about May 8, 1968, the plaintiffs sent the defendants written notice of the existence of the Trice patent, alleged infringement, and offered the defendants a sublicense under the patent. On September 30, 1968, the plaintiffs filed the present patent infringement action.

## II

Defendants challenge the validity of the Trice patent on several grounds:

2. Claim 10, which the Patent Office rejected as being predated by the Trice patent, stated:

"10. The method of aligning pipes comprising the steps of projecting a beam of light through and generally axially of the pipe and against the surface of a target, utilizing said light beam to project onto the target an image of visual markings accurately located in and on the axis of the pipe, and manipulating the pipe to cause said image to coincide with the center of the spot of light produced by said light beam on the target, and permanently positioning said pipe as thus manipulated."

This succinct paraphrase of the Trice claims in the patent in suit would now presumably be said by Woodruff to have been obvious in the light of prior art even in the absence of the Trice patent.

(1) lack of novelty under 35 U.S.C. §§ 101 and 102; (2) obviousness under 35 U.S.C. § 103; (3) failure to claim distinctly the invention and failure to describe it, 35 U.S.C. § 112; (4) old and exhausted combination; and (5) addition of new matter in violation of 35 U.S.C. § 132.

In a scholarly and detailed memorandum opinion, the district court considered and rejected each of the defendants' contentions. Although, and unfortunately, the district court opinion has not been published, we can conceive little purpose in now proliferating this reported decision by the factual minutiae necessarily examined and reported on by the district court in its disposition. Holding that the district court's opinion did correctly dispose of the validity issue, we therefore advert only to the principal bases on which we rest our approval and leave to those who may wish to know more about the prior art in this phase of ditchdigging the task of securing a copy of the district court's memorandum opinion from the clerk of that court.

■■ As the district court correctly pointed out, a party asserting a patent's invalidity bears the burden of proving invalidity and must overcome by clear and convincing proof the presumption of validity established by 35 U.S.C. § 282. Walt Disney Productions v. Fred A. Niles Communications Center, 369 F.2d 230 (7th Cir. 1966). Further, this initial presumption is strengthened where the Patent Office, before granting the patent, has considered the prior art references, or equivalent references, relied upon by the party claiming invalidity. Ekstrom-Carlson & Co. v. Onsrud Machine Works, Inc., 298 F.2d 765 (7th Cir. 1962), cert. denied, 369 U.S. 886, 82 S.Ct. 1160, 8 L.Ed.2d 287; American Needle & Novelty Co. v. Schuessler Knitting Mills, 258 F.Supp. 98, 105 (N.D.Ill. 1966).

■ In order to overcome the presumption of validity and to show that the Trice patent was obvious, the defendants introduced into evidence as prior art four publications and twenty-one patents, most of which had either been before the Patent Office Examiner or were equivalent to those that had been considered. After examining the evidence, the district court upheld the validity of the Trice patent. As stated, we concur in the court's evaluation of the exhibits and in its judgment on the validity issue.

## III

Regretfully, because of the obviously careful attention given to this case by the district court, we do not agree with its holding that there had been no infringement. Our review of the issue is based on documentary evidence and substantially undisputed facts and concerns, in essence, the legal construction of the scope of the patent claims. We are not bound, therefore, by the findings of fact of the district court, Hart v. Gallis, 275 F.2d 297, 299 (7th Cir. 1960). In any event, we are, on the entire evidence, left with the definite and firm conviction that a mistake has been committed. We conclude, contrary to the district court's opinion, that defendants did practice the patented Trice method. Having done so without having obtained a sublicense from Laser Alignment, they infringed the Trice patent.

## A

The basis of the district court's holding that defendants had not infringed the Trice patent was that "[t]he use of a beam generated by a laser in a method of laying sewer pipe cannot infringe a claim directed to use of a collimated beam of light contained in a patent whose application was filed before the invention of the laser." In conjunction with this conclusion, the court further stated that "even if we treated the laser beam under the 'doctrine of equivalents' we would not find it to be an equivalent to the 'collimated narrow beam of light' called for in the Trice patent claims."

We think that the district court placed undue emphasis on the apparatus creating the collimated beam of light. The important point is that the use of a collimated beam of light is a step in the Trice methods patent. The claims of a patent are the measure of its grant, see Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950), Milcor Steel Co. v. Fuller Company, 316 U.S. 143, 62 S.Ct. 969, 86 L.Ed. 1332 (1942), and Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U.S. 405, 419, 28 S.Ct. 748, 52 L.Ed. 1122 (1908). A fair reading of the Trice claims indicates that Trice's invention consisted of a *method* of, not an *apparatus* for, laying underground pipe by projecting *any* collimated narrow beam of light through pipes as a reference line, the intercept of which with a translucent target provides a guide for the laying of such pipes. We find no real dispute in the record of the fact that the laser beam used by the defendants was a collimated narrow beam of light. Under the simplified, literal infringement test set forth in *Graver, supra*, 339 U.S. at 607, 70 S.Ct. at 855,

"[i]n determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out and that is the end of it."

We, therefore, have conceptual difficulty in typifying the laser beam when utilized in the Trice method as being a substituted process step. The laser beam, like the white light beam originally used in the practice of the Trice method, is a "collimated narrow beam of light" called for by the Trice patent. To emphasize the fact that the collimated beam of light to be used in the patented method may be produced by a variety of apparatus is to lose sight of the patent's most significant characteristic —it relates to a method, not to apparatus.

We find it unnecessary, however, to rest our decision on the simple *Graver* test, set forth above. We turn to a consideration of the applicability of the doctrine of equivalents:

"The test of identity or equivalence of two processes is not the apparatus or materials used but whether they involve identical or equivalent steps. Steps are equivalent if they work in substantially the same way to accomplish the same results." Kemart Corp. v. Printing Arts Research Laboratories, Inc., 201 F.2d 624, 629 (9th Cir. 1953). (Footnotes omitted.)

The district court in finding the doctrine of equivalents not to be applicable focused on the fact that the laser had not been invented at the time the Trice patent application was filed. In support of the result it reached in this respect, the district court relied on three Supreme Court decisions: Gill v. Wells, 22 Wall. 1, 89 U.S. 1, 22 L.Ed. 699 (1874); Fuller v. Yentzer, 94 U.S. 288, 24 L.Ed. 103 (1876); and Halliburton Oil Well Cementing Co. v. Walker, 329 U.S. 1, 67 S.Ct. 6, 91 L.Ed. 3 (1946).

As we read these cases, ample basis exists for differentiating them factually from the case before us. Indeed, on the point in question, *Fuller* and *Halliburton* treat the matter in dicta. The decision of the Court in *Gill* to reverse the lower court could have rested on any one of several grounds, the timing portion pertinent here not being the primary basis of the Court's decision. Nevertheless, there seems to be support for a doctrine in patent law that for the doctrine of equivalency to be applicable the substituted process step must have been known at the date of the patent as a proper substitute. See 69 C.J.S. Patents § 303, at 878 (1951).

Even if we assume arguendo, despite the fact that the laser beam is literally a collimated narrow beam of light, that the existence or nonexistence of the laser might have some bearing on the infringement issue, it is our opinion that the district court improperly determined

the crucial time to be the date of the patent application, here 1957, rather than the date the patent was granted, January 1964.

The cases relied upon by the district court do not specify whether the date of application or the date of granting controls. *Gill*, for example, states that "the substituted ingredient in such a case must be one which was known at the date of the original patent as *a proper substitute* for the ingredient left out." (Emphasis in the original, 89 U. S. at 31–32). Similar references to the vague term "date of the patent" appear in the other cases.

■ *A priori*, it would appear to us that to carve out of infringing status an equivalent substituted step, even though it clearly is within the literal language of the claim, if that step came into existence after the filing but before the grant would be to narrow unduly the protection supposedly afforded by the patent. We recognize, of course, that for the purpose of priority of invention the effective date of a patent is the filing of the application. See, *e. g.*, Alexander Milburn Co. v. Davis-Bournonville Co., 270 U.S. 390, 46 S.Ct. 324, 70 L.Ed. 651 (1926). The obvious necessity for a relation-back rule in cases of this type does not exist in the present situation.

■ In our opinion, the Supreme Court intended a patentee to be allowed to challenge successfully the use of a substituted ingredient that was known by persons reasonably skilled in the relevant art as of the date the Patent Office granted the allegedly infringed patent. For example, in Seymour v. Osborne, 11 Wall. 516, 78 U.S. 516, 555–556, 20 L.Ed. 33 (1871), decided several years prior to *Gill*, Mr. Justice Clifford, who also authored *Gill*, speaking for the Court, stated:

"They [holders of patents] cannot suppress subsequent improvements which are substantially different, whether the new improvements consist in a new combination of the same ingredients, or of the substitution of some newly-discovered ingredient, or of some old one, performing some new function *not known at the date of the letters patent,* as a proper substitute for the ingredient withdrawn from the combination constituting their invention. Mere formal alterations in a combination in letters patent, however, are no defence to the charge of infringement, and the withdrawal of one ingredient from the same and the substitution of another which was well known at the date of the patent as a proper substitute for the one withdrawn, is a mere formal alteration of the combination if the ingredient substituted performs substantially the same function as the one withdrawn." (Emphasis added.)

■ It appears to us that the Court clearly intended to adopt the theory that he who would deny a charge of infringement on the basis of the newness of the substituted element must have utilized an element that was not known as a proper substitute at the date the patent's claims were staked out in the public domain, *i. e.*, at the date the patent was no longer pending but was granted.

■ We hold, therefore, that it was erroneous to find noninfringement on the ground that the laser was not in existence in 1957, the date of the Trice application. To the extent that the district court concluded that the laser beam as a substituted element was insufficiently known at the date Trice was granted his patent, we cannot agree. The record fully supports the determination that in 1964, when the Trice patent was issued, "persons reasonably skilled in the art would have known," *Graver, supra,* 339 U.S. at 609, 70 S.Ct. at 857, that the laser beam could properly (and profitably) be used instead of the white collimated beam of light. Defendants' supplier, Blount and George, thought of using a light beam to lay sewer pipe in the early 1960's, before they had heard of lasers, and by the time they made a patent search in 1963 they considered lasers to be "the ideal solution." They investigated lasers and reached their

conclusions about the lasers' utility prior to the issuance of Trice's patent. We also note Finding of Fact No. 48, in which the district court found that commercial use and sale of lasers commenced in 1961 or 1962 and that lasers were readily available by 1963 or 1964. The patent claims speak as of the date of issue, and on that date the laser was sufficiently known.

## B

Turning now to the other defenses asserted by the defendants, we find them insufficient. The district court correctly found the Trice invention to be a valuable contribution to the art and one that fulfilled a long-felt need. The words of this court in Colgate-Palmolive-Peet Co. v. Lever Bros. Co., 90 F.2d 178, 192 (7th Cir. 1937), cert. denied, 302 U.S. 729, 58 S.Ct. 54, 82 L.Ed. 563, are apt here:

> "We do not agree that the discovery is a minor one or that the patent must be given a narrow construction. Only a liberal construction of the claims will consistently recognize the character of the patent."

Having considered the record in this light and having noted the processes employed by the defendants, there being no real dispute as to the factual aspects thereof, we hold that those findings of the district court purporting to set down factual differentiations between the methods employed by the defendants and the Trice method claims as precluding infringement are clearly erroneous. In reaching this result we have not been faced with any question of credibility nor any factual dispute. Because it can be clearly ascertained from the record that infringement did occur, we find no necessity to remand for any further determination in that respect.

In Woodruff's initial operation at the Lake of the Four Seasons, Crown Point, Indiana, where Woodruff used the light beam method for laying sewer pipe, the method practiced came within the Trice claims. Subsequent operations assumed a more sophisticated hue principally in regard to the sizes and shapes of the targets. Typical of the changes was projecting the light beam on an offset basis from the central axis described in the claim. Doing so, in our opinion, accomplishes the same work in substantially the same way. Likewise, whether the target was one that fitted snugly and tightly or was one that would roll to the flow line of the pipe being laid, at the moment of alignment the target of necessity had to be geometrically related to the pipe and its alignment. Also, the fact that the stub is aligned by means other than a light beam is nothing more than an obvious but unsuccessful effort to give an air of difference in method.

The underlying rationale of the doctrine of equivalents, which we hold to be dispositive here, was well stated by Mr. Justice Jackson in Graver, supra, 339 U.S. at 607, 70 S.Ct. at 856, as follows:

> "But courts have also recognized that to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing. Such a limitation would leave room for—indeed encourage—the unscrupulous copyist to make unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of law. One who seeks to pirate an invention, like one who seeks to pirate a copyrighted book or play, may be expected to introduce minor variations to conceal and shelter the piracy. Outright and forthright duplication is a dull and very rare type of infringement. To prohibit no other would place the inventor at the mercy of verbalism and would be subordinating substance to form. It would deprive him of the benefit of his invention and would

foster concealment rather than disclosure of inventions, which is one of the primary purposes of the patent system."

What we have said herein on the matter of infringement applies to both claims of the Trice patent.

## IV

Plaintiffs cannot, however, invoke the doctrine of equivalents to its full extent if "file wrapper estoppel" is applicable, as defendants argue it is. Under that doctrine, an applicant who has limited or modified a claim in order to avoid its rejection by the Patent Office may not later expand his claim by including the excluded matter, or its equivalents, or by omitting the limitations. *See generally* Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 61 S.Ct. 235, 85 L.Ed. 132 (1940). *See also* Bishman Mfg. Co. v. Stewart-Warner Corp., 380 F.2d 336, 340 (7th Cir. 1967), cert. denied, 389 U.S. 897, 88 S. Ct. 216, 19 L.Ed.2d 214. "While equivalents may not be employed to enlarge patent claims to include areas explicitly abandoned before the Patent Office, a patent covers all devices which may fairly be called the equivalent of the ones described." Dole Valve Co. v. Perfection Bar Equipment, Inc., 298 F.Supp. 401, 406 (N.D.Ill.1968), aff'd, 419 F.2d 968 (7th Cir. 1969).

Defendants contend that plaintiffs are now foreclosed from making the broad claims that they supposedly are making in this litigation. As defendants read the history of the Trice patent, Trice withdrew claims of a scope comparable to that which plaintiffs here assert. Defendants point out that, of 18 claims originally filed, only two limited claims were accepted by the Patent Office. They rely particularly on the Patent Office's rejection of Trice's original Claim 3.[3]

The Patent Office had rejected amended Claim 3 as being unpatentable over Asbeck (a German patent) in view of Weser and Williamson (a German and an American patent). In response, Trice submitted several new claims and argued that the prior patents relied upon by the Examiner did not suggest the aligning of a plurality of pipe sections by projecting a light beam through

---

3. That claim provided:
 "3. Method of laying a sectional pipeline which comprises,
 (1) providing a collimated beam of light directed along the axis of the course of the pipeline to be laid,
 (2) placing a pipe section approximately in said course with one end axially aligned with said light beam,
 (3) temporarily unitarily associating target means with the opposite end of said pipe section,
 (4) manipulating the end of the pipe section associated with said target means to bring it into axial alignment with said light beam,
 (5) and fixing the pipe section in its aligned position."
Trice also proffered an amended version of Claim 3, which subsequently was cancelled:
 "3. Method of laying a pipeline having a plurality of pipe sections which comprises,
 (1) providing a collimated beam of light directed along the axis of the course of the pipeline to be laid from one end of the course,
 (2) placing a first pipe section approximately in said course with one end axially aligned with said light beam,
 (3) temporarily unitarily associating target means with the opposite end of said first pipe section,
 (4) manipulating the end of the pipe section associated with said target means to bring it into axial alignment with said light beam, and
 (5) fixing the pipe section in its aligned position, and
 (6) thereafter for each subsequent pipe section in sequence repeating
 (7) associating said target means with the end of the pipe section corresponding to said opposite end of said first pipe section,
 (8) manipulating the end of the pipe section associated with said target means to bring it into axial alignment with said light beam, and
 (9) fixing the pipe sections in their aligned positions."

the pipe section and fixing a target housing having a translucent screen to the end of a pipe. Subsequently, the Examiner no longer relied on the Asbeck patent but did continue the rejection on the basis of Weser in view of Williamson.

In his counterreply, Trice asserted that Weser does not disclose projecting a collimated beam of light along a selected axis nor the coupling of a target housing to the end of a tube and adjusting the housing and tube together until the center of the target is aligned with the beam.

After this final exchange of views, the Patent Office allowed the present claims in suit.

Plaintiffs read this file wrapper history as showing that the "primary point of novelty" of the Trice patent is:

> "the projection of a narrow collimated beam of light along a selected axis so that the pipe layer can align the pipe end-to-end, seriatim, over this beam with the light beam projected through the pipe; the aligning being accomplished by a target coupled to the end of each pipe section in a rigorous geometrical relationship to the flow line and central axis of the pipe; the actual aligning step being accomplished by moving the target and pipe together to align the crosshair of the target with the light beam."

Plaintiffs assert that this interpretation is not as broad as or broader than Trice's rejected Claim 3.

 In candor, and although the plaintiffs by implication at least seem to say that Trice gave up something during the arduous term of his efforts to secure his patent, we are struck by the fact that semantically the claims in the patent as granted are basically a rephrasing of that which had been rejected. It appears to us that what in fact happened was that Trice weathered the storm on the sea of semantics and was finally successful in persuading the Examiner that that which Trice had rephrased in his final submission of claims was patentable as he probably should have been able to do on the initial effort.

Even though patent law lexicon may harbor semantical niceties of distinction, not always easily discernible, in looking at the claims in the patent as granted, we are convinced that we have not read them any more liberally than their fair intendment calls for and certainly not so as to include any aspect of the method foregone during the pursuit of the patent.

Accordingly, we reject the file wrapper estoppel contention.

## V

Defendants allege that plaintiffs have misused the Trice patent, limited as it is to method, by requiring those in the pipe laying business to purchase or lease plaintiffs' equipment in order to obtain a sublicense to practice the patented method. Thus, plaintiffs are accused of attempting to extend improperly a method patent to the unpatented apparatus needed to practice such method. The Patent Office had expressly refused to grant Trice his apparatus claims.

Alignment offers a different version of its business practices. It explains that it sells both licenses to practice the Trice method and a system of equipment which is designed to be used in conjunction with the Trice method. Because the apparatus is adapted for the Trice patented method, Alignment requires each purchaser of the apparatus to obtain a sublicense under the patent. Alignment contends, however, that it does not require a contractor to purchase the system in order to obtain a sublicense. Contractors may purchase equipment from whomever they choose, and Alignment offers sublicenses to purchasers of competitors' equipment on terms that are identical to those offered to purchasers of its own equipment. See United States Gypsum Co. v. Na-

tional Gypsum Co., 387 F.2d 799, 802 (7th Cir. 1967).

The district court rejected the defendants' contentions that Alignment has failed to follow these policies and that plaintiffs have wrongfully threatened litigation in an effort to prevent any use of laser equipment to project a light through a pipe against a target within a pipe:

"Believing . . . that their method was being infringed, plaintiffs were not remiss in attempting to prevent use of such equipment since such equipment naturally was thought to encompass the Trice method. The letters advising sewer contractors and others of possible infringement . . . plainly refer to the Trice patent as a method patent and offer for sale a license for $3,000 to practice such method. These letters do not require or even offer for sale the Alignment equipment. We do not read Alignment's operating policy bulletins . . . as evidencing any attempt to control the sale and rental of unpatented apparatus. We are unable to find any credible evidence of patent misuse by plaintiffs."

Questions of patent misuse are for the trier of fact to determine. Beckman Instruments, Inc. v. Technical Development Corp., 433 F.2d 55 (7th Cir. 1970), cert. denied, 401 U.S. 976, 91 S.Ct. 1199, 28 L.Ed.2d 326. The evidence supports the district court's findings.[4]

We have considered the other contentions raised on this appeal by the defendants and find them to be without sufficient merit to warrant a further extension of this opinion.

Accordingly, the judgment insofar as it finds patent validity and no misuse is affirmed, but it is reversed insofar as it finds lack of infringement. The cause is remanded for further proceedings relating to damages and other relief appropriate under the circumstances and in accordance with this opinion.

4. The district court limited its determination of no misuse to the period prior to the issuance of its opinion. Because of its decision, with which we disagree, that the Trice patent claims do not encompass the use of a laser beam, it also warned that if the plaintiffs continued to demand that sewer contractors obtain a sublicense, plaintiffs would be misusing the patent. Our reversal of the court's finding of noninfringement eliminates the need for such a warning.